**MATTEL, INC.**

v.

**UNITED STATES.**

C.D. 3531; Protest Nos. 66/69722–82335.

United States Customs Court,
First Division.

Aug. 8, 1968.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Hadley S. King, New York City, of counsel); R. Kenton Musgrave, Hawthorne, Cal., associate counsel; for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Arthur E. Schwimmer and Andrew P. Vance, New York City, trial attorneys), for defendant.

Before WATSON and MALETZ, Judges.

**1000**

MALETZ, Judge:

This case involves the proper classification of wigs for dolls. The wigs were classified by the collector under item 737.20 of the Tariff Schedules of the United States as parts of dolls, and assessed with duty at 35 percent ad valorem. Plaintiff claims that the merchandise is properly classifiable under the *eo nomine* provision for "wigs" in item 790.70, with duty at 14 percent ad valorem.

■ At the trial, the government abandoned and repudiated the collector's classification and thus relinquished its presumption of correctness in this case. See e. g., Smith & Nichols (Inc). v. United States, 18 CCPA 16, 18, T.D. 43974 (1930); International Vitamin Corp. v. United States, 19 Cust.Ct. 76, 77, C.D. 1071 (1947). The government now claims a new classification for the wigs under item 737.90 as "[t]oys, * * not specially provided for * * * other," carrying a duty rate of 35 percent ad valorem.

Quoted below are the pertinent statutory provisions:

### Tariff Schedules of the United States

| Item | Articles | Rates of Duty 1 |
|------|----------|-----------------|
| 737.20 | Dolls, and *parts of dolls* including doll clothing ........................... [Emphasis supplied.] | 35% ad val. |
| | \* \* \* \* \* \* | |
| | Toys, and parts of toys, not specially provided for: | |
| | \* \* \* \* \* \* | |
| 737.90 | Other ........................... | 35% ad val. |
| | \* \* \* \* \* \* | |
| 790.70 | Wigs, toupees, chignons, and similar articles .............................. | 14% ad val. |

Schedule 7, Part 5

Subpart E—Models; Dolls, Toys, Tricks, Party Favors

Subpart E headnotes:

1. The articles described in the provisions of this subpart (*except parts*) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *. [Emphasis supplied.]

2. For the purposes of the tariff schedules, a "*toy*" is any article chiefly used for the amusement of children or adults.

General Headnotes and Rules of Interpretation

10. General Interpretative Rules.

\* \* \* \* \* \* \* \* \* \*

(ij) *a provision for "parts" of an article* covers a product solely or chiefly used as a part of such article, but *does not prevail over a specific provision for such part.* [Emphasis supplied.]

———◆———

The record consists of a stipulation, the testimony of seven witnesses for the plaintiff, four witnesses for the government, ten exhibits for the plaintiff and four exhibits for the government. The stipulation was as follows:

(1) Defendant concedes that the articles described as wigs on the in-

voices are, in fact, wigs, and are described in item 790.70.

(2) Plaintiff concedes that said articles are chiefly used for the amusement of children or adults, and were chiefly so used on and immediately prior to July 29, 1964, which was the date of entry. *Both parties reserve the right to offer testimony as to the manner in which the articles are used in the Los Angeles area.* [Emphasis supplied.]

(3) The manner in which said articles are used in the Los Angeles area is the same as the manner in which they are used throughout the United States, and is the same as the manner in which they were used on and immediately prior to July 29, 1964.

The imported wigs being concededly "wigs" of the type specifically described in item 790.70, if the record establishes that these wigs are "parts" of dolls, then General Interpretative Rule 10(ij) and the headnotes to Subpart E require that the specific provision for wigs prevail. Hence, the single issue is whether the wigs in this case are "parts of dolls."[1] If they are, then (as defendant concedes) plaintiff's claim is correct; if they are not, defendant prevails.

We now consider the facts of the case as shown by the record. In 1959, plaintiff first introduced on the market a doll known as the basic "Barbie" doll, which proved to be immensely popular with little girls. As an officer of plaintiff put it, little girls "identify * * * [the "Barbie" doll] with a quality image.

They identify it with * * * almost a way of life." The basic play pattern with the doll involves the selection and change of her clothing by the little girl playing with her. It may be added that the "Barbie" doll has fiber hair that has been permanently rooted into her head by machine, which effectively prevents the color and style of the hair from being altered. Because of that characteristic, changing hair style and color is *not* a part of the play function with the basic "Barbie" doll.

In late 1963, after the basic "Barbie" had been on the market for some 4 years, plaintiff introduced a significant variation called "Fashion Queen Barbie" which was "a very deluxe Barbie doll to sell at a higher price than the regular doll, including as part of the play pattern, the ability to change the hair color and hair style * * *." That "ability to change the hair color and hair style" was accomplished through the design and development of a special sculptured doll head and the wigs which are the subject of this case.

In the design and development of the special sculptured head and wigs for "Fashion Queen Barbie," some 6,000 man-hours were expended (by sculptors, engineers, chemists, hair stylists, and others) during a period beginning in February 1962 and extending into 1963. The resulting product (head and wigs) was patented. The basic concept and objectives of the invention (which were testified to by the holder of the patent) are summarized in the patent applica-

---

1. Defendant asserts in its brief (in passing) that, since plaintiff has formally stipulated that the imported articles are chiefly used for the amusement of children or adults and were so used on and immediately prior to the date of entry of the merchandise, this is conclusive that the articles are toys in and of themselves. Such assertion overlooks the fact, however, that the stipulation left open to proof the manner of use of the wigs and, therefore, the question of *how* the wigs were "chiefly used for the amusement of children or adults" was the subject of much of the evidence at trial. Through such evidence—which was not objected to by defendant—plaintiff sought to establish that the wigs in this case were used for the amusement of children or adults as *parts* for the so-called "Fashion Queen Barbie" doll, and that they were not toys in and of themselves on the basis that they had no independent play value whatever. In this context, the obvious intent of the stipulation was that, in the event plaintiff failed to establish that the wigs were "parts" of dolls, it would be conceded that they were chiefly used for the amusement of children, *i.e.*, toys—as claimed by defendant.

tion which was filed August 17, 1962, as follows:

The concept of a wig or replaceable hairdo for a doll is not new, but the articles found in the prior art have been quite unsatisfactory from several points of view. Often these hairdos are quite unrealistic. Further, they often are not readily removable, or when removable, tend to loosen and fall off while the doll is being handled. These deficiencies appear to stem generally from the unstable nature of the wigs or headpieces which have been used prior to this time. Such unstable base construction results in ununiform shape and appearance. Further, the unstable base results in a headpiece which is not securely fastened to the doll and which therefore causes the headpiece to loosen or come off easily.

Accordingly, it is a prime object of the present invention to provide a novel and improved doll head and headpiece construction. More particularly, it is an object of this invention to provide a construction of doll head and removable headpiece which will hold the headpiece firmly upon the head of the doll and yet permit it to be readily removed and replaced by another headpiece.

It is a more specific object of this invention to provide a shape-retaining yet flexible wig or headpiece construction which will provide a more satisfactory replaceable hairdo.

It is a further object of this invention to provide improved connector means for releasably maintaining the headpiece or wig for a doll firmly but releasably upon the head of the doll.

It is still another object of the invention to provide a doll head construction designed to appear normal and complete without a headpiece, but adapted to cooperate with the headpiece to firmly but releasably retain the headpiece upon the doll's head.

It is also an object of this invention to provide such a construction wherein the visual design of the head itself does not interfere with the new visual impression created when the headpiece is mounted upon the head.[2]

The relationship between the patented special "Fashion Queen Barbie" doll head and the patented wigs in this case was further detailed by the inventor at trial. He testified that the head was designed to work in conjunction with the wigs so that the children could accurately place the wigs on the head, and so that the wigs would remain securely affixed to the head in the play that the children provided for them. The head, he indicated, was sculptured to provide an undercut on the doll's head to hold the wigs in place, and to orient the wigs so that when the hair style and color were changed by the child playing with the doll, the wigs would snap into place in a blue ridge around the edge of the head that resembled a bandeau. The rest of the sculpturing around the head, he added, was painted brown to simulate hair and thus to prevent "the doll from looking shockingly bald when the hair styles * * * [were] being changed." He further testified that the wigs are all of the same size; that they are designed and sold to work in conjunction with the head; and that the wigs are not complete articles in themselves and are not sold as a complete article, but rather are designed to be sold in conjunction with the head.

The witness pointed out that initially the wigs were designed to be sold with the very deluxe "Barbie" doll, with that model doll coming with the special sculptured head "and the wigs to go with it." He stated that the snapping into place of the wig upon the special head insures that the "hair [is] properly located and attractive." "The Barbie doll," he added, "is noted for being a very beautiful doll and the arrangement of the hair is an important element of the beauty of the doll. The wig is designed to snap into place correctly so the hair isn't disarranged and unattractive." The

2. The "wig," the "replaceable hairdo" and the "removable headpiece," mentioned in the patent, all refer to the wigs at issue in this case.

wigs here involved, another witness testified, "add the same glamour to the doll and the same situation as the grown-up situation with a real wig." "The children," he continued, "project themselves into the world of Barbie. What Barbie is doing is what they are doing. And if they want Barbie to be a glamorous blonde on one occasion and an equally glamorous red head on another one, that's the reason for the wigs. It is part of a complete play situation." In the words of a further witness "[t]he introduction of the Fashion Queen Barbie, with the wigs, enabled the little girl to further emulate an adult or grown-up situation by the use of three separate wigs * *."

As we have seen, the result of the development of the special head and wigs was, initially, the "Fashion Queen Barbie" doll. The response to and demand for this doll was so great that plaintiff thereafter introduced and marketed "Barbie's Teen-Age Fashion Model Wig Wardrobe" which was a conversion kit consisting of a special sculptured "Fashion Queen Barbie" head and three of the wigs involved in this case (each a different color and each with a different hair style—just as in the case of "Fashion Queen Barbie"). This conversion kit enabled a child to convert a basic "Barbie" doll into a "Fashion Queen Barbie" doll by removing the head of the basic "Barbie" doll and replacing it with the new "Fashion Queen Barbie" head that came in the kit. With the basic "Barbie" doll converted to the "Fashion Queen Barbie" doll, the child was then able to change the hair style and hair color of the "Fashion Queen Barbie" doll by means of the wigs that also came in the kit. The situation, in brief, is that without the special sculptured "Fashion Queen Barbie" head, the wigs could not be used.[3] And without the wigs, the doll with that sculptured head would not serve its basic intended function, namely, to provide the vehicle for a varied change of hair and color style through use of the wigs. Thus, the

wigs in this case were designed to be sold, and were in fact sold, *only* in conjunction with the "Fashion Queen Barbie" doll, or at least with the special sculptured head for the "Fashion Queen Barbie" doll. There is no evidence in the record that the wigs were actually used in any other manner whatsoever.

The "Fashion Queen Barbie" doll has, as discussed previously, simulated hair painted on the sculptured head, and hence, in the words of the patent application, is "designed to appear normal and complete without a * * * [wig]. Added to this, the testimony makes clear that in view of this characteristic, the "Fashion Queen Barbie" not only is a physically complete doll without a wig, it can be, and on occasion is, played with without a wig. However, the record demonstrates that more often than not the doll is used with a wig since "basically, the play involves the changing of the wigs." But while the record thus establishes that the "Fashion Queen Barbie" is a physically complete doll without a wig, and is sometimes played with in that fashion, the evidence is undisputed that the *wigs*—as distinguished from the doll—were actually used only for the purpose for which they were designed, intended and sold. This is to say that the record is uncontradicted that the wigs involved in this case were not played with independently in any fashion separate and apart from the "Fashion Queen Barbie" doll; that they were not and could not be combed; that they are not considered "toys," separate and apart from the doll; and that they do not have any independent commercial value separate and apart from the doll. To sum up, the undisputed evidence shows that the wigs here in issue were designed, intended and sold for use only with and in conjunction with the "Fashion Queen Barbie" doll and that they actually had no other value or use whatever.

 It is obvious against this background that the wigs cannot be "toys" for they do not provide amusement in

---

3. The wigs, as we have previously seen, could not fit over the basic "Barbie" head since that doll had permanently rooted hair.

and of themselves.[4] What remains therefore is to determine whether the wigs are "parts" of dolls—as plaintiff contends. Recent decisions of our appellate court on this question of whether an item constitutes a "part" of an article have made it clear (1) that the answer depends on the nature, function and purpose of the item in relation to the article to which it is attached or is designed to serve; and (2) that it is not determinative that the article operates, functions or can be used without that item. Directly in point is Trans Atlantic Company v. United States, 48 CCPA 30, C.A.D. 758 (1960), which involved the issue as to whether certain brackets used for mounting door closers on a door frame were "parts" of such door closers. The brackets were imported and sold as separate items, but had no commercial use other than for mounting a door closer on a door frame. The purchaser of the door closer could mount the closer directly on the door itself in which case the brackets were not required, or he could mount the closer on the door frame in which event the brackets were needed for the closer to operate efficiently. The court held that the brackets were "parts" of the door closers even though the closers could have been used without the brackets and, in so doing, rejected the rule set forth in United States v. Willoughby Camera Stores, Inc., 21 CCPA 322, 324, T.D. 46851 (1933), that to be classified as a "part" of an article an item had to be "an integral, constituent, or component part, without which the article to which it is to be joined, *could not function as such article*."[5] [Emphasis in original.] The court in *Trans*

4. In Gallagher & Ascher Company v. United States, 44 Cust.Ct. 355, Abstract 63848 (1960), articles were held to be toys, and not parts of toys, only because they had independent amusement value, not dependent upon the article to which they were subsequently attached. Clearly the implication is that if, as in this case, an article has no amusement or play value by itself, it may be a "part" of a toy, but it cannot be a "toy."

5. In *Willoughby*, the question was whether certain tripods were "parts" of cameras. The record showed that the cameras and tripods were rarely sold together; that the tripods were used for various other purposes; and that while the tripods and cameras were designed and constructed to be used together, and it might be necessary to use the tripods as supports for the cameras, the tripods were not integral, constituent or component parts of such cameras, without which the cameras could not function as such cameras. The court in *Trans Atlantic* specifically noted that the cameras and tripods involved in *Willoughby* were rarely sold together and that the tripods were used for various other purposes and hence concluded that the "rule of essentiality" set forth in *Willoughby* was merely dictum "except as * * * applied to a fact situation which is the same or directly comparable thereto * * *." 48 CCPA at 31–32. Such dictum, the court declared, was not *per se* dispositive where the "record shows that the brackets have but one commercial use, i. e., the mounting of a particular door closer on the door frame." *Id.* at 32. Additionally, the court in *Trans Atlantic*, upon reviewing the authorities, expressly limited the rule in *Willoughby* "to fact situations of the precise type which the court there had before it." *Ibid. Accord:* Gallagher & Ascher Company v. United States, 52 CCPA 11, 15, C.A.D. 849 (1964). Parenthetically, it is of course obvious that if an item is dedicated solely for use on a particular article and is essential to the functioning of that article, it is *a fortiori* a "part" of that article. Thus in Wico Corporation v. United States, 60 Cust.Ct., C.D. 3376, 282 F.Supp. 798 (1968), ebonite balls were found to be "parts" of bowling game machines on a showing that their only use was as parts of bowling game machines and that the machines could not be operated without them. On the other hand, in Engis Equipment Company v. United States, 60 Cust.Ct. ——, C.D. 3413 (1968), certain machine tool scales and projectors which were concededly essential to the operation of jig-boring machine tools were denied classification as "parts" of such machine tools because the record showed they were commercially usable with a multitude of other devices. Clearly dictum in these circumstances was our statement in *Wico* and *Engis Equipment* —quoting *Willoughby*—that to qualify as a "part" an import *must* be "an integral, constituent or component part, without which the article * * * could not *function as such article*." [Emphasis in original.]

*Atlantic* relied instead upon United States v. Carl Zeiss, Inc., 24 CCPA 145, T.D. 48624 (1936) (which held that separate view finders, not necessary for the operation of cameras in their original condition, were nevertheless "parts" of cameras) and said (48 CCPA at 32–33):

> Other cases which are consistent with the views expressed in the *Zeiss* case are: United States v. Bosch Magneto Co., 13 Ct.Cust.Appls. 569, T.D. 41434, where lamps and horns were held to be parts of automobiles; Welt & Sons v. United States, 5 Ct.Cust. Appls. 164, T.D. 34249, where music rolls for pianos containing equipment for the mechanical playing of the piano were held to be parts of musical instruments even though the pianos were complete musical instruments without the mechanical playing equipment; Durbrow & Hearne Manufacturing Co. v. United States, 9 Ct.Cust.Appls. 177, T.D. 38001, where sewing machine shuttles used to produce lock stitches for embroidery purposes were held to be parts of sewing machines which, with other shuttles, performed only the ordinary functions of a sewing machine; United States v. American Steel and Copper Plate Co., 14 Ct.Cust.Appls. 139, T.D. 41673, holding halftone screens used in ordinary photographic cameras were parts of photographic cameras although the cameras could be used without the screens; Stoeger v. United States, 15 Ct.Cust.Appls. 291, T.D. 42472, where a 32-shot magazine drum designed to be attached to and become a part of a regular 9-shot magazine pistol was held to be a part of the pistol. The magazine drum was not necessary to the use of the pistol with the 9-shot magazine. Its function was merely to permit a greater number of shots without reloading.

> In all of these cases, as in the present case, there was an option on the part of the purchaser of the article to use it either with or without the imported auxiliary devices. *When the purchaser elected to use the article with such auxiliary devices, the devices were held in each case to be parts of the article for which they were designed and intended for use. In all these cases the articles could have been used without the imported auxiliary device. In these cases the court considered the function of the auxiliary part when the purchaser elected to use it as a part of the article and did not consider it determinative that the article could function without the auxiliary part.* [Emphasis supplied.]

In the present case, the purchaser of the door closer has the option to mount it either on the door frame or on the door. Once he decides to use the closer on the door frame the brackets, as the view finders in the *Zeiss* case or the lamps and horns in the *Bosch* case, become necessary and required to so mount the door closer if it is to be operated efficiently in this position. When so used the brackets are attached to and clearly are "parts" of the door closers.

The decision in *Trans Atlantic* was reaffirmed in Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849 (1964), which involved the question as to whether auxiliary heaters for Volkswagen automobiles were classifiable as "parts of automobiles." [6] The heater aided in the safe and efficient operation of the Volkswagen by contributing to the comfort of the passengers in frigid temperature and to their safety by assisting in the removal of ice from the windshield, thereby enhancing the vision of the driver. However, the Volkswagen could be operated without the auxiliary heater. Notwithstanding this latter consideration, the court held that the heaters were classifiable as "parts of automobiles." In reaching that result, the court expressly relied upon its prior

---

**6.** The decision in *Trans Atlantic* was also reaffirmed in United States v. Westfield Manufacturing Company, 49 CCPA 96, C.A.D. 803 (1962), in which kickstands and lighting sets for bicycles were held to be "parts" of bicycles and not "accessories" even though the bicycles could be operated without them.

decision in *Trans Atlantic* and also upon its earlier decision in United States v. Antonio Pompeo, 43 CCPA 9, C.A.D. 602 (1955), quoting with renewed approval (52 CCPA at 14–15) its language in *Antonio Pompeo* that:

> The problem is not whether or not automobiles [articles] are customarily manufactured with superchargers [alleged parts], but rather what is the nature and function of the imported superchargers. At the time of importation these superchargers * * * are *dedicated irrevocably for use upon automobiles*. Such being the fact, it is unrealistic to attempt to determine the nature of the superchargers apart from their *undisputed ultimate use*. * * * [Emphasis in original.]

Accordingly, the court in *Gallagher & Ascher* concluded that the auxiliary heaters were "parts," noting (52 CCPA at 16):

> Here, as in *Pompeo*, the imported articles are dedicated to a sole specific use and "for no other use." Here, as in *Trans Atlantic Company*, the imported article serves a useful function. * * *
>
> The facts of record that the auxiliary heater was optional equipment; that the Volkswagen came equipped with a conventional heater and that the automobile could be operated without the additional heater, are not of such vital import as to be determinative of the issue. * * *

■ The principles of these decisions have full force and effect under the Tariff Schedules of the United States. Border Brokerage Company, Inc. v. United States, 58 Cust.Ct. 240, 245, C.D. 2948 (1967).[7] Applying these principles to the present case, we must conclude, for the reasons that follow, that the wigs here in issue are "parts" of dolls. In the first place, the record is uncontroverted that the wigs involved were solely used in conjunction with the "Fashion Queen Barbie" doll and had no other use. Second, the wigs were designed to be sold, and were in fact sold, only in conjunction with the "Fashion Queen Barbie" doll. Third, the wigs were necessary for the "Fashion Queen Barbie" doll to serve its basic intended function, namely, to provide the vehicle for a varied change of hair and color style through use of wigs. In such circumstances, it is not determinative, as we have seen, that the "Fashion Queen Barbie" doll is a physically complete doll without a wig and is sometimes played with in that fashion.

Still another consideration is worthy of mention. In this case, and in such cases as *Antonio Pompeo, Trans Atlantic, Westfield Manufacturing, Gallagher & Ascher,* and *Border Brokerage,* the "part" was designed and intended specifically to be used with the principal article. But in none of those cases (unlike this case) was the principal article also specifically designed and intended for use with the "part" involved. In fact, in *Gallagher & Ascher* and in *Border Brokerage* the principal articles (the automobiles and motorboats, respectively) had to be modified to accept the "parts." Here, on the other hand, the "Fashion Queen Barbie" doll and the wigs in issue were designed and patented at the same time specifically and solely for the purpose of being used with each other. The "Fashion Queen Barbie" doll head was designed and intended specifically to provide a secure and convenient base for the patented wigs, and the wigs, of course, were designed and intended specifically to be used on the patented "Fashion Queen Barbie" doll head. Thus, in addition to the facts in the cases discussed above, this case presents a situation where the principal article was designed and intended for use with the "part" just as much and as fully as the "part" was designed and intended to be used with the principal article. And this factor makes out an even stronger case for concluding that

7. In *Border Brokerage,* mufflers were held to be parts of motorboats despite the fact that they were optional equipment.

the items are "parts" than the cases cited above.

Significant, also, is the language of the statutory provision, item 737.20, covering "parts" of dolls. It provides for "parts of dolls including doll clothing." Clearly, this provision does not provide for doll clothing separately, but specifies that doll clothing is one type of "parts of dolls."

A doll's clothing can be removed, changed and selected according to the desires of the child playing with the doll. Clothing and wigs both are useful in making the doll attractive; both can vary the appearance of the doll; both can effect changes in style; both can effect changes in color; and both provide the essential aspects of the play situation with a doll. If doll clothing is "parts" within the intendment of item 737.20, wigs, we believe, must likewise be considered a type of "parts of dolls." They are, in our opinion, no more accessories than the dolls' clothing.

■ ■ At trial, defendant sought to establish that the wigs are not "parts" on the basis that doll wigs have on occasion been referred to as doll "accessories." [8] But as the cases cited above have shown, it is the nature, function and purpose of the item in relation to the article to which it is attached or designed to serve which determines whether the item is a "part" of the article for tariff purposes. What that "part" may be called or labeled for other purposes, in other contexts, establishes nothing in respect of customs classification. There can be no doubt, for example, that if the superchargers in *Antonio Pompeo*, the heaters in *Gallagher & Ascher*, and the mufflers in *Border Brokerage* had been called "accessories" when sold to the consumer instead of "optional equipment," they still would have been held to be "parts" for tariff purposes. For artificial labels do not determine this court's substantive decisions. See e. g., James Loudon & Co. v. United States, 30 Cust.Ct. 58, 69, C.D.

1497 (1953); Prosser v. United States, 1 Ct.Cust.Appls. 29, 31, T.D. 30850 (1910).

Moreover, the record does not establish that the wigs in this case are commonly referred to as "accessories." Defendant's only evidence on this point was a sample of a doll wig which was never manufactured nor sold by plaintiff (defendant's exhibit C), and a catalogue of a distributor other than plaintiff. The fact of the matter is that doll wigs are not generally referred to as "accessories" in the trade, and in trade parlance the wigs here involved are not necessarily considered to be "accessories" as opposed to "parts." For example, three separate doll wigs which were *not* manufactured or distributed by plaintiff and which are quite similar in detail and intended use to defendant's exhibit C are specifically labeled as "parts" on their packages and not "accessories." Similarly, *"Playthings"*—which is a basic source book providing market reference information for toy buyers and toy manufacturers, and is considered to be a "bible" in the industry—shows that wigs for dolls are not generally classified in the trade as "accessories." *"Playthings"* does not list doll wigs in the classified listing under "Doll Accessories," but lists "Doll Wigs" separately. Similarly, "wigs (doll)" constitutes a separate category under the listing of "Suppliers to Toy Manufacturers—Materials, Machinery, *Parts* and Services for Toy, Doll and Game Manufacturers." [Emphasis supplied.] What is more, with respect to the specific wigs involved in this case, they were uniformly considered by plaintiff, in the production process, as constituting "parts." Thus documents introduced in evidence by plaintiff demonstrate that the wigs' were given specific "toy part" numbers on both the import parts list and on the domestic parts list. More importantly, the record shows that (even if it were relevant) the use of the word "accessories" in the toy industry generally has no independent significance because the

8. There is no statutory provision for doll "accessories."

words "accessories" and "parts" are not considered in the trade necessarily to mean different things; rather, the record makes clear that they are terms which are used interchangeably in the industry.

In summary, we hold that the wigs in question are "parts" of dolls. In view of that circumstance, and since the wigs are concededly described as such in item 790.70,[9] General Interpretative Rule 10(ij) and the headnotes to Subpart E require that the specific provision for wigs under item 790.70 prevail. The protest is sustained, and judgment will be entered accordingly.

WATSON, J., concurs.

---

**9.** Item 790.70, as previously set out, covers "Wigs, toupees, chignons, and similar articles." This is an unrestricted and unqualified *eo nomine* provision for "wigs," among other things, and is governed by the long-established principle that an *eo nomine* designation; without limitation, includes all forms of the article. E.g., United States v. Williams Clarke Co., etc., 50 CCPA 67, 70, C.A.D. 822 (1963) ; C. J. Tower & Sons v. United States, 47 CCPA 85, 87, C.A.D. 734 (1960) ; United States v. Goffigon, 43 CCPA 172, 175, C.A.D. 625 (1956).